### HARRIS et al. v. PHILLIPS et al.[*]
(No. 11305.)

(Court of Civil Appeals of Texas. Fort Worth. Dec. 5, 1925. Rehearing Denied Jan. 23, 1926.)

1. Pleading ☞212

General demurrer was waived where not called to court's attention or acted upon.

2. Brokers ☞86(1)—Evidence held to support finding that defendant had not listed oil lease with brokers for sale at price of $12,000 and 5 per cent. commission.

In brokers' action for commission in sale of oil lease, evidence *held* to support finding that defendant had not listed lease with plaintiffs for sale at price of $12,000, at 5 per cent. commission.

3. Appeal and error ☞930(1).

Reviewing tribunal is required on appeal to construe evidence to support judgment.

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error dismissed for want of jurisdiction March 17, 1926.

**4. Brokers ⊚⇒41—Vendor held estopped to question brokers' right to commission for sale of oil lease under terms finally agreed upon, where accepting purchaser produced.**

Vendor *held* estopped to question brokers' right to commission for sale of oil lease under terms finally agreed upon, where he was fully informed of all facts while sale was executory, and before becoming obligated was permitted to refuse to continue with the deal, and, instead of repudiating transaction when so informed, accepted purchaser produced by brokers.

**5. Pleading ⊚⇒403(3)—Question not alleged in plaintiffs' petition, but alleged in defendants' answer and denied in plaintiffs' supplemental petition, was in issue.**

In brokers' action for commission in procuring sale of oil lease, issue whether defendant had listed oil lease with plaintiffs for sale at a price of $12,000, at 5 per cent. commission, was raised, though not alleged in plaintiffs' petition, where defendants in their answer so alleged, which allegation was denied in supplemental petition of plaintiffs.

**6. Brokers ⊚⇒86(1).**

Evidence *held* to support finding that plaintiff was authorized by defendants to sell oil lease, and that he was procuring cause of sale.

**7. Appeal and error ⊚⇒1068(1).**

Any error in placing burden of proof on defendants as to issue answered in their favor *held* harmless.

**8. Appeal and error ⊚⇒1068(1).**

Any error in placing burden of proof on defendants as to an issue which was not answered by jury *held* harmless.

**9. Brokers ⊚⇒84(1)—Defendants had burden of proving issue raised by them, and relied upon as fraud, that oil lease was listed with brokers at $12,000 with 5 per cent. commission.**

In brokers' action for commission of $2,000 for sale of oil lease, defendants had burden of proving issue presented by them, and relied upon as fraud, that lease was listed at price of $12,000 with plaintiffs, at 5 per cent. commission.

Appeal from District Court, Tarrant County; R. E. L. Roy, Judge.

Suit by J. O. Phillips and others against M. B. Harris and others. Judgment for plaintiffs, and defendants appeal. Affirmed.

M. B. Harris and McLean, Scott & Sayers, all of Fort Worth, for appellants.

Phillips, Trammell & Chizum, of Fort Worth, for appellees.

CONNER, C. J. This suit is one in which J. O. Phillips, J. B. Morrison, and Henry Seale, John Seale, and A. R. McElreath, composing the real estate firm of Seale Bros. & McElreath, complain of appellant M. B. Harris and other defendants named for the nonpayment of $2,000 claimed by the plaintiffs

as commission upon the sale of a certain oil lease situated in Eastland county, Tex. The plaintiffs allege, in substance, that the defendants owned the oil lease referred to, which stood in the name of the defendant A. D. Hodgson; that on or about the 29th day of May, 1922, the defendant Hodgson, acting for himself and all others interested, listed said lease for sale with the defendant Morrison, who acted for himself and J. O. Phillips, for sale at a net price, it being expressly understood by Hodgson and plaintiff Morrison that Morrison and Phillips were to have all they could sell said lease for over said price; that plaintiffs Morrison and Phillips enlisted the aid of the other plaintiffs, who were also engaged in selling oil leases for commission, and all together found a purchaser for said lease in the person of the Humble Oil & Refining Company; that plaintiff Henry Seale, knowing that the defendant M. B. Harris was interested in the lease, and being unable to communicate with the plaintiff Morrison at the time the purchaser was found, called Harris up over the telephone, asking Harris the price of said property; that Harris advised him and wired that defendants would take $10,000 net for said lease, by which it was meant and understood and agreed by and between plaintiff Henry Seale, acting for all the plaintiffs, and the defendant Harris, acting for all the defendants, that plaintiffs would receive all over $10,000 for said lease that they might be able to secure; that plaintiffs thereupon sold said lease to said refining company for $12,000, and requested the defendant Harris to come out and close the deal, which he did, being fully apprised at the time of the price at which the lease had been sold, and the fact that plaintiffs were to get the $2,000 above the $10,000 net price mentioned.

The defendants Harris and others answered by a general demurrer and general denial, and specially to the effect that the plaintiffs had not acted faithfully and fairly in representing the defendants, but had, on the contrary, willfully, deliberately, and fraudulently misrepresented the true facts to the defendants, and particularly to the defendant, M. B. Harris, in that the plaintiffs represented to the said M. B. Harris that the highest price they could get for said lease was $10,000, when in truth and in fact the plaintiffs had already been offered $12,000 for said lease, and that by reason of said false and fraudulent representation by the plaintiffs the defendant M. B. Harris was induced to send a telegram agreeing to accept the said $10,000; that immediately upon the defendant Harris learning the true facts, he repudiated the agency of the plaintiffs for the reason that the plaintiffs were attempting, instead of representing him faithfully, to perpetrate a fraud upon him, and had betrayed

⊚⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

and were betraying his confidence and their agency.

The plaintiffs, by a supplemental petition, denied the allegations of the defendants' answer, and specially denied that they did not faithfully and fairly represent defendants in the transaction of the sale, and specially denied that they misrepresented any fact to the said M. B. Harris or any of the defendants. In this connection plaintiffs further alleged that Harris was informed and knew when he sent the telegram mentioned in the defendants' answer that defendants had made a sale or expected to make a sale of the lease for more than $10,000, and so sent the telegram in question; that at such time no definite sum or price had been agreed upon between plaintiffs and the Humble Oil & Refining Company at which the lease was to be sold, but that Harris knew that plaintiffs had to sell the lease for more than that sum in order to earn a commission or receive any reward for their services, and that Harris was expressly informed by plaintiffs before he sent the telegram that plaintiffs expected to make a profit out of the transaction, and expected to sell the lease for more than $10,-000. Plaintiffs further allege in this connection that, after Harris went to Eastland to close the deal, and before the deal was closed, he was expressly and fully informed of the price and sum which had been agreed upon as the purchase price of the lease to be paid by the Humble Oil & Refining Company, and was fully informed of each and every fact of which he now claims to be ignorant, and was told that plaintiffs could deliver another lease to the Humble Oil & Refining Company if he did not want to make the deal for the price which he had agreed upon; that plaintiffs were entitled to a reward for their services in the matter, and expected to receive the $2,000 excess over the purchase price which Harris had agreed to take, and, so being in possession of each and all the facts as stated, the said Harris agreed to close the transaction and pay plaintiffs $2,000 as their compensation for their services, and the trade was closed with the Humble Oil & Refining Company upon such basis and such understanding; that said Harris did not repudiate plaintiffs' agency and did not refuse to close the deal, but, on the contrary, closed the transaction with the understanding and agreement that plaintiffs were to get the $2,000 as their compensation for their services.

The case was submitted to the jury in a charge embodying special issues, the charge, issues, and answers of the jury as indicated being as follows, to wit:

"Gentlemen of the jury, this case is submitted to you on special issues, and you will from the evidence answer the following questions:

"Special Issue No. 1: Question: State and find from the evidence whether or not at the time Henry Seale had the telephone conversations with M. B. Harris on May 29, 1922, he had a definite offer from the Humble Oil & Refining Company of $12,000 for the lease in question? Answer 'yes' or 'no.' Answer: Yes.

"Special Issue No. 2: Question: Did M. B. Harris list the lease in question with John Seale, of the firm of Seale Bros. & McElreath, to sell prior to the 28th day of May, 1922, at a price of $12,000 at a 5 per cent. commission? Answer 'yes' or 'no.' Answer: No.

"Special Issue No. 3: If you have answered special issue No. 2 in the negative, you need not answer this question, but if you have answered same in the affirmative, then: Question: Did the said John Seale, of the said firm, agree to sell or attempt to sell said lease at said price and for a 5 per cent. commission? Answer 'yes' or 'no.' Answer: ——

"Special Issue No. 4: Question: Did the firm of Seale Bros. & McElreath act in good faith towards the said M. B. Harris in the sale of said lease to the Humble Oil & Refining Company? Answer 'yes' or 'no.' Answer: Yes.

"Special Issue No. 5: Question: State and find from the evidence whether or not M. B. Harris agreed with the plaintiffs at Eastland, Tex., on May 30, 1922, to close the sale of the lease to the Humble Oil & Refining Company and pay plaintiffs $2,000? Answer: Yes.

"The burden of proof is upon the plaintiffs to prove by a preponderance of the evidence (and by a preponderance of the evidence is meant the greater weight of the testimony) the affirmative of special issue No. 5, and upon the defendants to prove the affirmative of special issues Nos. 1, 2 and 3, and the negative issue No. 4. You are the exclusive judges of the credibility of the witnesses, of the weight to be given to their testimony, and of the facts proved.      R. E. L. Roy, Judge."

"We, the jury, return our answers to the above and foregoing special issues as our verdict in this case. B. N. Cross, Foreman."

Upon these findings the court rendered judgment for the plaintiffs, and defendants have appealed.

[1] In an elaborate brief appellant urges that the court should have sustained a general demurrer to the appellees' petition, and that the court's failure to do so constitutes fundamental error for which the judgment should be reversed. Appellant indeed pleaded the general demurrer, and the record fails to disclose that it was called to the court's attention or acted upon in any way, and therefore as such was waived. Smith v. Hughes, 86 S. W. 936, 39 Tex. Civ. App. 113; Stockton v. Brown (Tex. Civ. App.) 106 S. W. 423. The petition, if subject to the demurrer at all, which we are not inclined to think, is certainly not so fundamentally erroneous as to require a setting aside of the judgment.

The contention of appellants is to the effect that appellant M. B. Harris had listed the lease in question with John Seale, of the then firm of Seale Bros., to sell at the stated sum of $12,000 for a commission of 5 per cent., and it is urged that as such agency

Seale Bros., whom alone Harris recognized, owed to him the utmost good faith in endeavoring to get for appellants the highest price obtainable for the lease at the compensation stated, and that, being under such a duty, said agents acted in bad faith in failing to disclose the fact that the lease had been sold for $12,000, and in assuring appellant Harris that $10,000 was the greatest sum at which they could handle the lease, and thereby extracted from Harris the statement that he would sell the lease for $10,000 net.

The testimony of appellant Harris was to the effect that a short time prior to the 28th day of May, 1922, he had listed the lease in question for sale with John Seale, of the firm of Seale Bros. & McElreath, at Eastland, Tex., at the price of $12,000, agreeing to pay a 5 per cent. commission on that price; that on the 29th day of May, 1922, Henry Seale, of the firm of Seale Bros. & McElreath, called him, Harris, on the telephone at Fort Worth and said:

"'I have got a sale, or we have got a sale, for your oil lease in the Georgia addition.' * * * He said to me, or asked me, what I would take. I said, 'I have priced it to John at $12,000.' 'Well,' he said, 'you are too high on it.' I said, 'Well, that is our price.' He says, 'I can't get $12,000 for it.' I says, 'Well, that is what we hold it at anyhow.' After talking some time the conversation ceased, and he called me the second time. I did not call him the second time; he called me, and said, 'We have got a sale to one of the big companies, and you had better trade while you can; you can't get $12,000.' I says, 'What can you get?' He says, '$10,000; that is the best we can get.' I says, 'You can't get $11,000?' He says, 'No, we can't get $11,000; $10,000 is the best we can get.' I then told him I would confer with such as I could reach by phone and call him back. I did confer with them, and called him back, and said, 'Our price is $12,000.' He says, 'We can't get that; $10,000 is all we can get.' I says, 'How much do we get of that?' He says, 'You get $10,000.' * * * I says, 'I will come out to-morrow, and we can determine what is best to do.' He said, 'No, the purchaser is here now; it is one of the big companies, and we have got to close it this evening or they will be gone; they won't wait for you to come here to-morrow, and you must send me an acceptance of that this evening or you will lose the deal.' Based on that conversation I sent the message that has been read here. I went out the next day as I told him I would do."

The telegram referred to was dated May 29, 1922, addressed to Henry Seale, Eastland, Tex., and was as follows:

"Your proposition over telephone to pay ten thousand net for lease on thirty acres (Georgia addition) accept lease to protect offset, as per telephone agreement."

John Seale testified:

"I never had a contract at all or an agreement with Mr. Harris with respect to selling the 30 acres. Mr. Harris told me that he would pay me 5 per cent. commission if I would sell it for $12,000. I could not say how long that was before this transaction took place. * * * I did not attempt to sell that lease for $12,000 or anything of that kind at that time. I didn't think the lease was worth anything like that at that time. There was not any property selling in that neighborhood worth anything like that that I can recall. I was talking with him at the depot. I just asked him what he wanted for it, and he said he would take $12,000 and pay 5 per cent. commission, and that is about all there was said, because he was about ready to get on the train. * * * If he had wanted to make a sale of that property I would not have had time to have entered into a written contract."

Henry Seale testified, among other things, to the effect that John Seale had never said anything to him about the conversation that his brother John had had with Harris in relation to the sale of the lease in question.

James Morrison, one of the plaintiffs, testified that he lived at Cisco, Tex.; that he knew Mr. Arthur Hodgson, one of the defendants in the suit; that while in Fort Worth he met Mr. J. O. Phillips, one of the plaintiffs, who told him, Morrison, that he, Phillips, knew of a lease out in Eastland county in the neighborhood of some operations that he thought he might sell. He said he thought Mr. Arthur Hodgson owned it, and Phillips took him to Mr. Hodgson, with whom he had a conversation about the lease. He further testified:

"I asked him what he would take for it, and he gave me the price. He said that they had had it some little time, and that they wanted to sell it, and they were willing to take $300 an acre; and the lease was a 30-acre lease, and I told him that I thought I could very likely handle it in some way, and if I could handle it it would not take me very long. * * * And he said all right; if I could make any sort of a deal on it or handle it myself he would be very glad for me to, and with that understanding and with that conversation, as far as the lease was concerned, why I left Mr. Hodgson."

The evidence further discloses that the legal title to the lease was in Mr. Hodgson. Mr. Morrison further testified:

That he returned home, and soon thereafter went to see Mr. McMeans, one of the men in the land department of the Humble Oil & Refining Company, and interested him in the lease at the price of $400 per acre; that some 4, 5, or 6 days thereafter Mr. McMeans told him that his chief had been up to Cisco from Houston and was interested in the lease in question. "However, he did not say that he would buy it, and I did not know at that time whether the lease had been sold or not. I went on the presumption that it had not been sold and had not been handled. * * * I was down at Rising Star, a little town below Cisco. In order to hedge him and get in touch with the owners of the lease, Mr. McMeans of the Humble Oil & Refining Company went to Eastland to see Mr. McElreath [of the firm of

Seale Bros. & McElreath] and his firm, knowing that they lived there very where that lease was, and that we were very well acquainted, and that they could get in touch with the parties who owned the lease pending my return to town so that he could get in touch with me, and when he next saw me he told me that they were interested in the lease and would likely buy it, and the matter was taken up with parties in Fort Worth through my friends, Mr. McElreath and Seale Bros. Then, I think it was probably the day after that, anyway it was just as soon as they could negotiate matters a little bit, that McMeans informed me that he wanted me to go to Fort Worth to help close this deal with him; anyway that he, Judge Harris, was coming out there, and he, was interested in the lease, and that he was coming out to the town of Eastland where the gentleman lived to close the deal on the lease, and he thought the deal had been closed. So we went over to Eastland, and I met the gentleman there, and that was the first time that I met Judge Harris or that I knew that any one was interested in the lease other than Mr. Arthur Hodgson."

The witness Morrison further testified to the effect that all of the parties met in the office of Henry Seale, and he was introduced to Judge Harris, who said that he had not known that he, Morrison, was in the deal, and had not known that he had anything to do with it, and said:

"I don't know whether I want to go on through with this deal the way it stands now or not, and I said to Judge Harris, 'Judge, you know that the oil business has been very quiet for some time; the price of oil is low, and the only people with any money are some of the big companies. The individual operators are not buying, they have had a hard time, and there has been no trading and no selling of leases, and I think you are getting a mighty good price for this lease when you get $10,000 for it, net to you, and I think it is an opportunity for you to get it that you probably won't have again, and the probabilities are that if you don't make this sale you are going to lose the sale, and, while we are making a profit on it, it is the first profit we have made on any kind of a deal for a long time, and there are five of us interested in it, and at that you are selling the lease for more money than the lease was put up to me at when I first went into the deal.' Well, he argued against making the sale on that basis. His objection to making the sale was that he had found that we were making a profit of $2,000 on the lease, and that he was getting $10,000, which he had agreed to do. We would turn this lease over, or take it over ourselves and then transfer it to the Humble Oil & Refining Company for $12,000, giving us a profit of $2,000, and he had, however, come out there with the understanding that he was to get $10,000 for the lease, net to him; that was the agreement. When he found—we laid the cards absolutely on the table as far as that is concerned, and told him that we would transfer this lease to the Humble Oil & Refining Company for $12,-000—I mean the $2,000—that was our profit in handling the deal. He objected to that, and after talking pro and con in regard to it I suggested to Judge Harris, 'Now, Judge, we have a purchaser.' The name of the purchaser at that time had never been disclosed; however, we all know that since the deal is closed that one of the Standard companies was buying the lease. I said to him, 'Now Judge, we have the purchaser in the next office, and he has the money to buy it. If you are willing to take $10,000 for this lease and give us $2,000 we will close the deal and go through with it in that way. If you don't want to close the deal on that basis, and there is going to be any misunderstanding whatever in regard to it, why let's eliminate that. We will call this deal off, and you can go home, and I think maybe we can interest this man in some other leases in that neighborhood, but I strongly advise you that you take this money for this lease, because this company absolutely wants this lease, and I do not know when another company will, and you are getting more out than it was priced to me a few days ago; but if you are not willing to take the $10,000 and give us the $2,000 we will just call the deal off and quit, because this is our purchaser, and this man don't want to buy this lease if there is going to be any controversy in regard to the settlement of it.' Of course he said that he would like to pay a commission, and he thought $2,000 was too much for us to get, etc., but he did not know; he says, 'I am undecided. I don't know hardly what to do.' And then he went outside to some man who was there and considered, and finally came back into the room after being out 15 or 20 minutes, and we went over this proposition again as to the situation in the oil business, and I went over the same proposition again with Judge Harris to make it very clear that I wanted him to understand that we didn't want any misunderstanding, and if he didn't want to make this deal I felt I could make another one anyway and if there was going to be any misunderstanding and he didn't want to go through with this deal and take $10,000 and give us $2,000, which was a big price for the lease to him and not much to us, just to say so and we would call the deal off. When Judge Harris came back he had very little discussion after that, and he said, 'Well, bring your purchaser in, and I will close the deal on that basis.' And I went to the door and called Mr. McMeans in, and he came in with his duplicate contracts and finished the deal with Judge Harris, and I went in the other room. Then I didn't see Judge Harris in this transaction until he had signed his contract with the Humble Oil & Refining Company. Then I went in, when Mr. McMeans got up, and said to Judge Harris, 'I believe it would be a good thing for you to give me a memorandum of some sort or an agreement that we are to get this $2,000.' 'Well,' he said, 'I am making that assignment, and I am making this deal through the Seale boys.' I says, 'That is perfectly all right to me; I would just as soon you would make it through them as through me.' He rather ignored me in this deal, as he hadn't met me before, but I said, in regard to that contract, I said, 'I would like for you to give us a memorandum,' and he said—then turning to John Seale, who was present—and said, 'No; you have the telegram from me showing that I am to get $10,000 for this lease, and you will get the two, and it is not necessary to go into a contract.' John

Seale then said that he had known Judge Harris very favorably for some time, and he didn't think it was necessary, and I said, 'Very well,' and turned around, and I have not seen Judge Harris from that day until this, I don't believe."

[2, 3] The testimony of Henry Seale and McElreath in essential particulars corroborated that of Mr. Morrison. Henry Seale, among other things, testified, as stated, that his brother John had never said anything to him about the conversation with Judge Harris on the depot platform, and by reference to the findings of the jury in answer to special issue No. 2 it will be seen that, as a matter of fact, Judge Harris had never listed the lease in question with John Seale, of the firm of Seale Bros. We think the evidence authorized the submission of this issue and supports the jury's finding thereon, and that with it falls the very basis of appellant Harris' contention in this case. The evidence, construed favorably to appellees, as it is our duty to do, tends to show that Morrison, and not the Seale Bros., was the listed agent. There is no contention in the evidence or in the argument that Hodgson did not have authority to list the lease for sale with Morrison on the terms Morrison states, and, if so, we see no bad faith on the part of Morrison in procuring the same upon the terms he did. After Morrison's conference with the representative of the Humble Oil & Refining Company, the interest of the other plaintiffs was enlisted as aids, and Henry Seale, without any knowledge on his part of the conversation of appellant Harris with his brother, John Seale, called Harris up on the telephone and made the inquiries, with the result indicated in the evidence. But if by a standard construction of the evidence it could be said that there was any fraud or bad faith in the dealings so portrayed, Harris was fully informed of all the facts while the sale was still executory, and before he had become obligated, and was tendered the opportunity to refuse to continue with the deal. Instead of repudiating the transaction when so informed, the appellees' purchaser was produced and accepted, and the evidence of appellees is to the effect, and the jury's findings are, that he agreed to take $10,000 and pay appellees $2,000 as commission, and concluded the transaction on this basis.

[4] Such conduct, we think, undoubtedly constituted a waiver and ratification and adoption, precluding appellant from questioning appellees' right to the commission for which they recovered judgment. See Dallas Trust & Sav. Bank v. Pyle (Tex. Civ. App.) 258 S. W. 219; Rea v. Johnson (Tex. Civ. App.) 270 S. W. 1077; Thompson v. Ferguson & Turnley (Tex. Civ. App.) 250 S. W. 204; Samuel v. Branche (Tex. Civ. App.) 211 S. W. 841; Texas Brokerage Co. v. John Barkley & Co., 128 S. W. 431, 60 Tex. Civ. App. 466.

What we have said we think sufficiently answers appellants' assignments that "the court erred in not instructing a verdict for defendants as requested by defendants on file in this case."

Appellants' seventh assignment of error is as follows:

"The court erred in not setting aside the findings of the jury as to special issue No. 2 as requested in defendants' motion for a new trial, because there was no pleadings of plaintiffs to support the findings of the jury."

[5, 6] The record fails to show any exception to the submission of this issue at the time it was given, and, while the plaintiffs' petition contained no allegation that the lease in question had been listed with John Seale, of the firm of Seale Bros. & McElreath, the defendants in their answer did so allege, which allegation was denied in the supplemental petition of plaintiffs, thus raising the issue. The evidence already detailed, we think, sufficiently shows that the verdict of the jury in answer to that issue was supported by the evidence. Indeed, the very basis of the defense in this case seems to have been that the firm of Seale Bros. were the agents of the defendants for the sale of the lease in question, and that their action in the matter as such agents was not in good faith. The findings of the jury and the evidence supports the theory of the appellees, we think, that Morrison in fact was the authorized agent of the defendants, and that he was the procuring cause of the sale, and we fail to see that any fraud was committed to the prejudice of the plaintiffs, under the theory evidently adopted by the jury and later affirmed by the court's action in refusing to set aside the verdict and in rendering judgment as he did.

[7-9] Objection is now urged also to the charge on the burden of proof. It will be noted that by the charge the burden of proof was put upon the defendants to establish the affirmative to issues Nos. 1, 2, and 3, and the negative of No. 4. No. 1 was answered in appellants' favor and is relied upon as an evidence of fraud. No. 3 was not answered, and hence the objection has no pertinency. Issue No. 2, as we have already noted, was distinctly presented by defendants, and constituted, as we have observed, the foundation of defendants' claim of fraud. So that we think the court properly placed the burden upon the defendants as to this issue.

Other assignments of error have been presented, but what we have said already, we think, sufficiently disposes of them all, and, finding no reversible error, we conclude that all assignments of error should be overruled and the judgment affirmed.